UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

IN RE:

JOHN WILLIAM WEST, III,

          Appellant,

v.                                            Case No: 8:13-cv-2530-T-36
                                            Bankr. No.: 8:10-bk-0584-MGW
                                            Adv. No.: 8:10-ap-00824-MGW

ALETA DIANE CHRISMAN, etc.

          Appellee.

_____/

## OPINION AND ORDER

This cause comes before the Court upon Appellant John William West's ("West") appeal (Doc. 15) of the Bankruptcy Court's Order finding that Appellee Aleta Chrisman ("Aleta"), as Personal Representative of the Estate of E. Boyer Chrisman ("Estate") and as Co-Trustee of the E. Boyer Chrisman Amended and Restated Trust, dated June 28, 2005 ("Trust"), is entitled to recover from West a debt in the amount of $212,478.00 that is non-dischargeable pursuant to 11 U.S.C. §§ 523(a)(4) and 523(a)(2)(A) (Doc. 1-1). Aleta filed a response in opposition to the appeal (Doc. 20), and West filed a reply in further support of his appeal (Doc. 23). This Court has jurisdiction over the appeal pursuant to 28 U.S.C. § 158. Aleta also filed a motion for attorneys' fees (Doc. 21), and West filed a response in opposition to that motion (Doc. 22). On September 4, 2014, the Court held oral argument on the appeal and the motion for attorneys' fees. Doc. 29. Upon due consideration of the record, the briefs, and the oral argument, the Court will now AFFIRM the Bankruptcy Court's Order and DENY the motion for attorneys' fees.

## I.      BACKGROUND

### A.      Events Prior to West's Bankruptcy Filing

This dispute arises from the fee agreement entered into between West and Aleta as Personal Representative of the Estate and Co-Trustee of the Trust following the death of E. Boyer Chrisman ("Chris"), for services relating to the administration of the Trust and the Estate (Doc. 1-96, "Fee Agreement").  Chris was introduced to West by Johnson Savary, an attorney who was referred to Chris by his accountant and close personal friend, Ray Leich ("Leich").  Docs. 1-77 at 62-63; 1-125 at 53.  West subsequently worked for Chris as his attorney, helping him with tax and estate planning.  Doc. 1-125 at 53.  In June 2005, Chris and his wife, Irene Chrisman ("Irene"), met with West to sign updated versions of Chris's Amended and Restated Trust ("2005 Trust Instrument") and Last Will and Testament ("2005 Will"), both of which were prepared by West.  Docs. 1-93, 1-94.  In the 2005 Trust Instrument, Chris named himself and his wife as Co-Trustees, with West to serve as successor Co-Trustee upon the death of one spouse and Aleta to serve as successor Co-Trustee with West upon the deaths of both spouses.  Doc. 1-93 ¶ 10.3.

Chris passed away unexpectedly on May 7, 2008.  Doc. 1-77 at 134.  On May 19, Aleta, West, and West's paralegal and office manager, Sandra Wigglesworth ("Wigglesworth"), met to discuss how Chris's estate should be handled.  Doc. 1-77 at 98-99, 135.  Aleta testified that, at this meeting, West told her that he was Co-Trustee of the estate.  Doc. 1-77 at 101.  Aleta also testified that, at this meeting, there had been no discussion regarding attorneys' fees.  Doc. 1-77 at 101.  However, West and Wigglesworth testified that, at this meeting, Aleta had been given an unsigned copy of the Fee Agreement.  Docs. 1-77 at 204; 1-125 at 64-65.

Thereafter, on June 2, 2008, Aleta, Irene, West, and Wigglesworth held a meeting during which Irene, due in part to her failing health, resigned as Co-Trustee, and Aleta accepted that role.  Docs. 1-77 at 102; 1-97.  At that meeting, Aleta also signed the Fee Agreement, which proposed

that fees be "calculated pursuant to the provisions of Florida Statutes §733.6171 and §737.2041," but included no calculation of the fees.  Docs. 1-77 at 102-03; 1-96 at 2-4.  Four days later, Aleta returned to West's office to meet with Wigglesworth to sign some documents and pay filing fees. Doc. 1-77 at 113.  During that visit, she received a copy of the Fee Agreement, which again did not contain any calculation of what the fees might be.  Doc. 1-77 at 113-14.  Aleta testified that Wigglesworth told her the fees would be close to one percent of the estate and that it was set by Florida law, Doc. 1-77 at 114, but Wigglesworth denied that she told her this, Doc. 1-77 at 190-91.  On June 17, West signed a document entitled "Acceptance of Co-Trustee."  Doc. 1-99.

Aleta and West next met on July 17, 2008.  At that meeting, West provided Aleta with an attachment to the Fee Agreement, which included, for the first time, a calculation of the fees to be paid.  Docs. 1-77 at 115-16, 148; 1-96 at 8.  Per the worksheet, West's fees under the Fee Agreement would total $355,887, to be paid in three equal installments.  Doc. 1-96 at 8.  Aleta testified that she was shocked by the amount, but that West told her that the bill was "set by Florida statute and law," and that, prior to his passing, her father had known about it.  Doc. 1-77 at 116-117.  Wigglesworth and West both testified that West never told Aleta any such thing.  Doc. 1-77 at 191-192; 1-125 at 74.

Aleta paid from the Trust the first installment of the fees on July 21, 2008.  Doc. 1-111. Subsequently, during the summer and early fall of 2008, the stock market collapsed, and a disagreement between West and Aleta arose over how the Trust funds were to be invested.  Doc. 1-125 at 75-79.  This dispute came to a head on October 13, when West resigned as Co-Trustee of the Trust.  Docs. 1-125 at 79; 1-90.  However, West remained as attorney for the Trust, Doc. 1-125 at 80, and on October 23, Aleta paid from the Trust the second installment of the fees, Doc. 1-91.

In November 2008, Leich met with Aleta and her sister, where he learned of the Fee Agreement and became "outraged."  Doc. 1-77 at 72, 79.  Leich offered to charge $15,000 to $20,000 to complete the Form 706, Doc. 1-77 at 79-80, and referred Aleta to the GrayRobinson law firm, which terminated West as attorney for the Trust, Docs. 1-77 at 82, 1-125 at 82.  Leich ultimately completed the Form 706, charging approximately $21,000 for his services.  Doc. 1-77 at 80.  Aleta never paid West the final installment of the fees under the Fee Agreement.  Doc. 1-77 at 166-67.  Instead, she brought suit against West in Florida's Twelfth Judicial Circuit Court, seeking a return of the fees already paid.  Doc. 1-190.

## B.      Bankruptcy Court Proceedings

While Aleta's case was pending in state court, West filed a voluntary petition for Chapter 7 bankruptcy.  Doc. 1-4.  Shortly thereafter, Aleta commenced an action against him in the Bankruptcy Court in her capacity as Personal Representative of the Estate and as Co-Trustee of the Trust.  Doc. 1-6.  In her Complaint, Aleta alleged that West had abused his fiduciary position as Co-Trustee of the Trust to fraudulently enter into a fee arrangement with the Estate and the Trust.  Doc. 1-6.  Aleta sought a determination that West therefore owed a debt equaling the fees already paid him under the arrangement, that would not be dischargeable by his bankruptcy petition.  Doc. 1-6.

The Bankruptcy Court bifurcated the proceedings.  In the liability phase, the Bankruptcy Court ruled in Aleta's favor following a two-day trial.   The Bankruptcy Court first found that West had assumed the role of Co-Trustee immediately after Chris's death in May 2008, as opposed to the later date of June 17, 2008, when he signed the acceptance document.  Doc. 1-179 at 9-10. The Bankruptcy Court next found that Aleta had not had an opportunity to review the Fee Agreement when she signed it on June 2, 2008; that Wigglesworth had told her on June 6, 2008 that the fee was going to be "closer to 1 percent of the value of the estate"; and that Aleta did not

4

fully understand the Fee Agreement until July 17, 2008.  Doc. 1-179 at 11-13.  Finally, the Bankruptcy Court found that the Fee Agreement was consummated on July 17 because it did not contain the amount of the fee, or "the most important material provision," until that date; that West had represented to Aleta on July 17 that the fee was set by Florida law and her father had known about it; and that Aleta had justifiably relied upon those statements in entering into the Fee Agreement.  Doc. 1-179 at 14-15.  The Bankruptcy Court thus concluded that West had made fraudulent representations in violation of his fiduciary duties, and that any fees West owed to Aleta would not be dischargeable pursuant to 11 U.S.C. §§ 523(a)(2)(A) and (a)(4).  Doc 1-179 at 16-17.

In the damages phase, the Bankruptcy Court also ruled largely in favor of Aleta following a single-day trial.  For opening the estate, the Bankruptcy Court credited the testimony of Aleta's expert, and found that West was entitled to a sum of $680, or one hour of attorney time at $350 per hour and three hours of paralegal time at $110 per hour.  Doc. 1-204 at 8-9.  With regard to West's work as attorney for the trustee, the Bankruptcy Court first found that West had performed only about one-third of the work.  Doc. 1-204 at 9.  The Bankruptcy Court then calculated that the statutory fee for this work would be $81,524 based on an estate size of approximately $23 million discounted by a factor of two-thirds.  Doc. 1-204 at 9.  Finding this fee to be unreasonable, the Bankruptcy Court concluded that "the statutory approach to compensation does not apply in this case because clearly that would lead to an unreasonable fee, and West only did one-third of the work and never provided work product that provided a benefit to getting the work completed." Doc. 1-204 at 10.

The Bankruptcy Court thus attempted to determine a lodestar fee based on "a reasonable hourly rate [applied] to a reasonable number of hours."  Doc. 1-204 at 10.  It first found that

Wigglesworth's testimony was credible and consistent with that of Aleta and Aleta's expert, and that she had likely done most of the work. Doc. 1-204 at 11. It noted, however, that Wigglesworth did not (and was not required to) keep time sheets, and that the only record from her work was a one-page preliminary asset list created for the Form 706 tax return. Doc. 1-204 at 11. It further found that West was not credible when he testified, in contradiction to his prior testimony, that he had spent one to one and a half days per week over four or five months working on the matter. Doc. 1-204 at 12.

The Bankruptcy Court therefore credited Aleta's expert's testimony as to the amount of time that had been expended: 40 to 50 hours of attorney time, and 50 to 60 hours of paralegal time. Doc. 1-204 at 12-13. Applying the upper ends of the hours estimates and the rates of $350 per hour of attorney time and $110 per hour of paralegal time, the Bankruptcy Court calculated a total fee "at the top end" of $24,100. Doc. 1-204 at 13. It then summed this figure with the $680 fee for opening the estate, and allowed a total compensation figure of $24,780, which, when subtracted from the $237,258 in fees actually paid to West, resulted in a total non-dischargeable debt of $212,478. Doc. 1-204 at 19. In arriving at this figure, the Bankruptcy Court rejected West's contention that he should be entitled to some sort of risk premium, finding that the trust did not have any difficult assets and that it was not the attorney's responsibility to give investment advice. Doc. 1-204 at 13.

## II.   STANDARD OF REVIEW

The district court functions as an appellate court in reviewing decisions of the bankruptcy court. *See In re Colortex Indus., Inc.*, 19 F.3d 1371, 1374 (11th Cir. 1994). Legal conclusions of the bankruptcy court are reviewed *de novo*, and findings of fact are reviewed for clear error. *See In re Globe Mfg. Corp.*, 567 F.3d 1291, 1296 (11th Cir. 2009). "A factual finding is clearly erroneous when although there is evidence to support it, the reviewing court on the entire evidence

is left with the definite and firm conviction that a mistake has been committed." *Morrissette-Brown v. Mobile Infirmary Med. Ctr.*, 506 F.3d 1317, 1319 (11th Cir. 2007) (quotation marks and citations omitted).   The burden of showing clear error falls on the party seeking to overturn a bankruptcy court's finding.  *See In re Caribbean K Line, Ltd.*, 288 B.R. 908, 911 (S.D. Fla. 2002).

## III.   DISCUSSION

### A.   Fee Agreement

West challenges the Bankruptcy Court's finding that the parties entered the Fee Agreement on July 17.  West argues that the parties entered into the Fee Agreement on June 2, because that was when Aleta signed it and understood it to be consummated.  West also argues that the June 2 document contained all the essential terms of the contract, and that the worksheet with the attorney fee calculation that was provided to Aleta on July 17 was not a term of the contract, but rather merely "a numerical expression of what the fee agreement language provides."  Doc. 15 at 30. Finally, West contends that Aleta's failure to fully understand the contract on June 2 does not render it invalid.

The Court disagrees.  Under Florida law, an enforceable contract exists where there has been a meeting of the minds as to the essential terms of the contract.  *See Leopold v. Kimball Hill Homes Fla., Inc.*, 842 So. 2d 133, 137 (Fla. 2nd DCA 2003).  However, "[w]here essential terms of an agreement remain open, and subject to future negotiation, there can be no enforceable contract."  *Dows v. Nike, Inc.*, 846 So. 2d 595, 602 (Fla. 4th DCA 2003).  Further, ambiguities in an essential term will render a contract unenforceable.  *See King v. Bray*, 867 So. 2d 1224, 1226 (Fla. 5th DCA 2004).

Here, Paragraph 3 of the Fee Agreement, the "Amount of Fee" provision, is an essential term of the contract.  "[W]hat constitutes an essential term of a contract will vary widely according to the nature and complexity of each transaction and must be evaluated on a case specific basis."

*ABC Liquors, Inc. v. Centimark Corp.*, 967 So. 2d 1053, 1056 (Fla. 5th DCA 2007).   However, courts have consistently held that purchase price is an essential term of a contract.   *See, e.g.*, *Cavallaro v. Stratford Homes, Inc.*, 784 So. 2d 619, 621 (Fla. 5th DCA 2001) (holding that there was no enforceable contract because the parties' agreement "failed to contain the requisite essential terms such as the purchase price").

Without any showing of the actual calculation of fees, however, this term, as it appeared in the June 2 version of the Fee Agreement, was open and ambiguous.   Indeed, although the "Amount of Fees" purports to be calculated pursuant to Florida Statutes §§ 733.6171 and 737.2041, these sections do not set forth a "definite proposition" as to the fees.   Rather, both sections provide that the parties "may agree to compensation determined in a different manner than provided in this section."   *See* Fla. Stat. §§ 733.6171(2), 736.1007(2).   Further, although these sections include a fee schedule that is "presumed to be reasonable," the "Amount of Fee" provision does not clearly and unambiguously state that the fees are to be calculated according to this particular schedule.   The provision's vague reference that fees are to be "based on the value of the inventory assets of the probate estate, including the value of any homestead property, and any assets held in trust," Doc. 1-96 ¶ 3, does not resolve this ambiguity.   It is entirely plausible that the parties could have agreed to a fee calculated according to the value of the estate but that differs from the "presumptively reasonable" schedule set forth in Florida Statutes §§ 733.6171 and 737.2041.   The fee calculation in the appendix was the provision that actually set the fee amount, and was not merely "a numerical expression of what the fee agreement language provides."[1]

---

[1] That Aleta did not pay the first installment of the fees until shortly after July 17 provides further support that the fee calculation appendix actually set the fee.   Indeed, the Fee Agreement provides that "[t]he first installment is due upon the execution of this Agreement," Doc. 1-96 ¶ 4, but Aleta did not pay and could not have paid the first installment on June 2, because there was no agreed-upon fee at that time.

Because an essential term in the June 2 version of the Fee Agreement was open, ambiguous, and subject to future negotiation, no enforceable contract could have been entered into on that day. Further, Aleta's subjective belief that the contract was consummated on June 2 has no bearing as to whether an enforceable contract was actually entered into. *See Robbie v. City of Miami,* 469 So. 2d 1384, 1385 (Fla. 1985) ("[A]n objective test is used to determine whether a contract is enforceable . . . . The making of a contract depends not on the agreement of two minds in one intention, but on the agreement of two sets of external signs—not on the parties having meant the same thing but on their having said the same thing.") (quotation marks and citation omitted). Finally, although a party's ignorance regarding the contents of the agreement does not generally render it unenforceable, Aleta's apparent ignorance of the terms of the contract at the time she signed it is irrelevant because, as of June 2, there was no sufficiently definite agreed-upon fee and thus could have been no objective meeting of the minds. Accordingly, the Court will affirm the Bankruptcy Court's finding that the contract was not formed until July 17, the date the fee calculation appendix was provided to Aleta.[2]

### B. Non-dischargeable Debt Under § 523(a)(4)

11 U.S.C. § 523(a)(4) provides that debts "for fraud or defalcation while acting in a fiduciary capacity" are not dischargeable under the bankruptcy code. In order to invoke this provision, the creditor must first show that the fiduciary relationship existed prior to the act that created the debt. *See In re Fernandez-Rocha*, 451 F.3d 813, 816 (11th Cir. 2006). The creditor must then show that there was a "defalcation"—a term whose meaning has "never been entirely

---

[2] By concluding that the Fee Agreement was entered into on July 17, the Court need not reach the question as to whether West became Co-Trustee immediately upon Chris's death, because it is undisputed that, at the very latest, he accepted that role as of June 17, a month prior to the date of the fee agreement. The Court notes that, in rendering its opinion, it therefore does not make any findings with regard to this issue.

clear," but that generally refers to "a failure to produce funds entrusted to a fiduciary."  *Id.* at 817 (quotation marks and citations omitted).

In *Bullock v. BankChampaign, N.A.*, 133 S. Ct. 1754, 1759 (2013), the Supreme Court elaborated that a "defalcation" requires either "an intentional wrong" or "reckless conduct of the kind set forth in the Model Penal Code."  A fiduciary thus satisfies the required state of mind when he or she acts with a conscious disregard of a substantial and unjustifiable risk that his or her conduct will violate a fiduciary duty.  *See id.*  A "substantial and unjustifiable risk" is one that, "considering the nature and purpose of the actor's conduct and the circumstances known to him, its disregard involves *a gross deviation* from the standard of conduct that a law-abiding person would observe in the actor's situation."  *Id.* at 1760 (quotation marks and citation omitted).

Relying on *DeMello v. Buckman*, 916 So. 2d 882 (Fla. 4th DCA 2005) and *Gainesville Health Care Center, Inc. v. Weston*, 857 So. 2d 278 (Fla. 1st DCA 2003), West argues that he cannot be guilty of defalcation because the fees he sought to charge the estate comported with Florida law.  West's argument is unavailing.  To begin with, the fact that a fee is "presumptively reasonable" does not mean that it is actually reasonable.  Indeed, the Bankruptcy Court found that such a fee would not be reasonable in this case.  Moreover, neither case stands for the proposition that charging a presumptively reasonable fee necessarily precludes a finding of a breach of fiduciary duty.

In *DeMello*, the plaintiff alleged that the trustee had improperly paid her individual attorney's fees (along with the trust's attorney's fees) from the trust, but the court rejected this argument, finding that there was "no evidence that these were improper trust expenditures, and the amount was within that authorized pursuant to section 737.2041."  *DeMello*, 916 So. 2d at 889.  The court in *DeMello* thus relied on the fact that the fee fell within the presumptively reasonable

amount only as evidence to support its finding that the trustee had not improperly allocated some trust funds for her own personal attorney.  It did *not* hold that there was (or could be) no breach of fiduciary duty *as a consequence* of the fact that such fees were within the statutory limit.  *DeMello* is further distinguishable because it did not involve a situation where the attorney for the trust was also a trustee.

*Gainesville* is likewise distinguishable.  There, the appellee argued that the appellant had breached its fiduciary duty by entering into an arbitration agreement, but the court rejected this argument, noting only that it "found no authority which holds that a fiduciary breaches that duty by entering into an otherwise valid arbitration agreement.  Arbitration agreements are favored means of dispute resolution, and doubts concerning their scope should generally be resolved in favor of arbitration."  *Gainesville*, 857 So. 2d at 288-89 (citation omitted).  West is apparently suggesting that *Gainesville* holds that a fiduciary cannot breach its duty when it enters into *any* "otherwise valid" agreement, but reading *Gainesville* this broadly would eviscerate the very concept of a fiduciary, which comes with attendant duties of loyalty, candor, and good faith, *see Capital Bank v. MVB, Inc.*, 644 So. 2d 515, 520 (Fla. 3rd DCA 1994) ("A fiduciary owes to its beneficiary the duty to refrain from self-dealing, the duty of loyalty, the overall duty to not take unfair advantage and to act in the best interest of the other party, and the duty to disclose material facts.").  The dicta in *Gainesville* is thus better understood to apply in the context of arbitration agreements, which are "favored means of dispute resolution," and which are not at issue here.

Here, West was Co-Trustee before he entered into the Fee Agreement with Aleta.  Accordingly, as the Bankruptcy Court held, he had the duty to do more than simply not to act unreasonably.  He had the duty to "administer the trust *in good faith*, in accordance with . . . the interests of the beneficiaries," and to "administer the trust *solely in the interests of the*

*beneficiaries*." Fla. Stat. §§ 736.0801 and 736.0802 (emphases added). And he had "[the] obligation to make full disclosure to the beneficiary of all material facts." *First Union Nat'l Bank v. Turney*, 824 So. 2d 172, 188 (Fla. 1st DCA 2001).

By entering into the Fee Agreement without affirmatively advising Aleta that such a fee was not mandatory or explaining any alternatives to her, West acted in reckless disregard of these duties. West is an experienced attorney who has practiced law for many years. He admits that he knew that the provisions of Florida Statutes §§ 733.6171 and 737.2041 were not mandatory,[3] and that he had a duty to minimize attorneys' fees, *see* Doc. 1-125 at 103. Despite having this knowledge and experience, however, instead of advising Aleta of her options, West pushed Aleta to sign the fee agreement, even going so far as to tell her that it was "required" by Florida law. At the very least, West acted in reckless disregard of his duties of loyalty and candor, and grossly and egregiously deviated from the standard of conduct that a law-abiding fiduciary would observe. Accordingly, the Court will affirm the Bankruptcy Court's finding that West committed a defalcation while acting as a fiduciary, in violation of 11 U.S.C. § 523(a)(4).

### C.    Non-dischargeable Debt Under § 523(a)(2)(A)

11 U.S.C. § 523(a)(2)(A) precludes the discharge of a debt for money obtained by "false pretenses, a false representation, or actual fraud." Courts have generally interpreted this section to require the traditional elements of common law fraud. Accordingly, a creditor must prove that: "(1) the debtor made a false representation to deceive the creditor, (2) the creditor relied on the misrepresentation, (3) the reliance was justified, and (4) the creditor sustained a loss as a result of the misrepresentation." *In re Bilzerian*, 153 F.3d 1278, 1281 (11th Cir. 1998).

---

[3] Indeed, West makes much of the fact that Paragraph 3 of the Fee Agreement uses the word "propose," Doc. 15 at 39-42, and Wigglesworth testified that West sometimes charged flat fees, Doc. 1-77 at 192.

Although West testified that he never told Aleta on July 17 that percentage-based fees were required under Florida law, he does not challenge as clearly erroneous the Bankruptcy Court's finding of fact to the contrary.  Rather, he argues that Aleta was not justified in relying on this statement because she is a college educated woman who can read and write English and who has held a long-term responsible job.  Doc. 15 at 41.  According to West, Aleta apparently should have been suspicious when she read the word "propose[d]" in the fee agreement, but because she did nothing to investigate the discrepancy between the use of the word "propose" in the document and his use of the word "require" in his oral statement, she could not justifiably rely on his oral statement that such fees were required under Florida law.  Doc. 15 at 40-41.

West's argument is not persuasive, however, because as Co-Trustee, he was undisputedly acting in a fiduciary capacity and therefore "cannot appeal to the doctrine of caveat emptor," *Capital Bank*, 644 So. 2d at 520 (quotation marks and citation omitted).  Accordingly, the cases to which West cites are distinguishable because none involved statements made by fiduciaries.  *See In re Wilken*, 377 B.R. 927 (Bankr. M.D. Fla. 2006) (debtor was not a fiduciary); *In re Wiggins*, 250 B.R. 131 (Bankr. M.D. Fla. 2000) (same); *In re Merrick*, 347 B.R. 182, 188 (Bankr. M.D. La. 2006) (same); *Colombo Bank, F.S.B. v. Sharp*, 477 B.R. 613, 619-20 (D. Md. 2008) ("without a preexisting relationship of trust and confidence, the Bank was not justified in relying on [the] self-produced title report").

Here, Aleta was entitled to rely, and did justifiably rely, on West's statement because he was a fiduciary.  Indeed, as a college-educated woman, she had the capacity and knowledge to recognize that she *should* be able to rely on him, as Co-Trustee, to act in good faith, to affirmatively disclose all material facts, and to act solely in the interest of the beneficiaries.  *See In re Vann*, 67 F.3d 277, 281, 283 (11th Cir. 1995) ("Justifiable reliance . . . is gauged by an individual standard

13

of the plaintiff's own capacity and the knowledge which [she] has, or which may fairly be charged against [her] from the facts within [her] observation in the light of [her] individual case.") (quotation marks and emphasis omitted). The Court will therefore affirm the Bankruptcy Court's finding that West made a false representation upon which Aleta justifiably relied to her detriment, in violation of 11 U.S.C. § 523(a)(2)(A).[4]

### D. Lodestar calculation

West argues that the "default" compensation for services as attorney to the trust is calculated pursuant to Fla. Stat. § 736.1007(2). West further claims that, according to the lodestar calculation performed by the Bankruptcy Court, he did approximately 75% of the work. West thus concludes that he is owed 75% of the fee calculated pursuant to Fla. Stat. § 736.1007(2).

West's argument is not persuasive. First, Florida Statutes § 736.1007(2) does not provide for a "default" fee. Rather, it merely states that "*[u]nless otherwise agreed*, compensation based on the value of the trust assets . . . at the rate of 75 percent of the schedule provided in s. 733.6171(3)(a)-(h) *is presumed to be reasonable total compensation* . . . ." Fla. Stat. § 736.1007(2) (emphases added). A plain reading of the language reveals only that there is a certain fee schedule that is presumably reasonable, *not* that there is a default fee that automatically attaches in the absence of a contrary agreement.

Second, West's contention that he did approximately 75% of the work is misleading and illogical. West apparently arrives at his 75% figure by noting that his lodestar fee as calculated by the Bankruptcy Court was $24,780, but that GrayRobinson's fee was only $8,000 to $9,000. He

---

[4] In affirming the Bankruptcy Court's opinion on this issue, the Court need not (and does not) reach the issue as to whether West expressly told Chris he would not charge the trust an attorney fee based on a percentage of assets. Even if this finding of fact were clearly erroneous, West's statement that Florida law required the payment of a statutory fee is sufficient to support a violation of 11 U.S.C. § 523(a)(2)(A).

14

thus reasons that, based on the relative amount of fees, he performed 75% of the work.  This approach, however, is logically backwards—while fees may be calculated from hours worked, it is not conversely true that hours worked may be deduced from fees, much less relative hours worked from relative fees.  Indeed, adopting this approach would either unjustly punish Aleta for GrayRobinson's decision to charge lower fees or work more efficiently than West did, or unjustly reward West for his decision to charge higher fees or work less efficiently than GrayRobinson did.

Ultimately, West does not challenge as clearly erroneous the factual findings of the Bankruptcy Court as to his reasonable rate and number of hours worked.  Further, there is no law that requires his fees to be calculated pursuant to the statutory rate.  The Court will therefore affirm the Bankruptcy Court's calculation of West's reasonable fees.

### E.    Judgment as to Aleta as Personal Representative

West argues that it was error for the Bankruptcy Court to enter judgment in favor of Aleta both in her capacity as Personal Representative and in her capacity as Co-Trustee, because Aleta as Personal Representative never paid funds to West or his law firm and the only payment came from Trust property.  The Court disagrees.  The Fee Agreement expressly lists as the client "Aleta Diane Chrisman, *as Personal Representative of the Estate of E Boyer Chrisman a/k/a Eagleton Boyer Chrisman* and as Co-Trustee of the E. Boyer Chrisman a/k/a Eagleton Boyer Chrisman Trust Dated June 3, 1993."  Doc. 1-96 at 1 (emphasis added).  Importantly, even if the fees were paid from the Trust as opposed to the Estate, that does not alter the identity of the *payor*.  Because the Fee Agreement was entered between West and Aleta in both her capacities as Personal Representative and Co-Trustee, the Court will affirm the Bankruptcy Court's judgment for Aleta in both those capacities.

### F.      Aleta's Motion for Attorneys' Fees

Federal Rule of Bankruptcy Procedure 8020 permits a court to impose sanctions on an appellant if it determines that an appeal from a bankruptcy order is frivolous. Because the language of Rule 8020 is similar to that of Federal Rule of Appellate Procedure 38, courts apply cases interpreting Rule 38 in determining whether to grant sanctions under Rule 8020. *See Steffen v. Berman*, Case No. 09-cv-1953, 2010 WL 2293235, at *1 (M.D. Fla. June 7, 2010). Rule 38 sanctions are imposed when appellants raise claims that are "clearly frivolous," or "utterly devoid of merit." *Nettles v. City of Leesburg—Police Dep't*, 415 Fed. App'x 116, 123 (11th Cir. 2010) (quotation marks and citations omitted). In evaluating the merits of a claim, a court considers, *inter alia*, "bad faith on the part of the appellant and whether appellant's argument: addresses the issues on appeal properly; fails to support the issues on appeal; fails to cite any authority; cites inapplicable authority; makes unsubstantiated factual assertions; makes bare legal conclusions; or, misrepresents the record." *In re Land Resource, LLC*, Case No. 12-cv-961, 2013 WL 950690, at *1 (M.D. Fla. Mar. 12, 2013) (quotation marks and citation omitted).

After careful consideration of the parties' arguments on appeal, the Court concludes that Aleta is not entitled to sanctions. First, West is not, as Aleta suggests, merely "making the same arguments to this Court that were made to the Bankruptcy Court," and his arguments are "a serious attempt to undermine Judge Williamson's conclusions . . . ." Doc. 21 at 2, 4. Importantly, West applies the proper standard of review in challenging the Bankruptcy Court's factual findings, and does not merely reiterate that he is more credible. *Compare In the Matter of Generes*, 69 F.3d 821, 828 (7th Cir. 1995) ("Generes has offered no justification for his conduct in the district court, other than to re-assert his own version of the facts, arguing that we should believe him and not the Morrells."). Further, West has set forth multiple grounds that, if accepted, would support a reversal

of all or parts of the Bankruptcy Court's opinion.  Although the Court finds that his arguments are ultimately unpersuasive, they are not "utterly devoid of merit."

Moreover, there is no evidence that West appealed in bad faith or for purposes of delay, or that he made any unsubstantiated factual assertions or misrepresented the record in any way.  And although the Court ultimately may not agree with his interpretation of the law, West cites proper authority that plausibly supports his arguments.  Because the Court finds that West's appeal is not frivolous, it will deny Aleta's motion for sanctions.

Accordingly, it is hereby **ORDERED** and **ADJUDGED**:

1. The Order of the Bankruptcy Court, entered on July 30, 2013, which found that Plaintiff Aleta Chrisman, as Personal Representative of the Estate of E. Boyer Chrisman and as Co-Trustee of the E. Boyer Chrisman Amended and Restated Trust, dated June 28, 2005, is entitled to recover from Defendant John William West, III, a sum of $212,478.00 that is non-dischargeable pursuant to 11 U.S.C. §§ 523(a)(4) and 523(a)(2)(A) is **AFFIRMED**.

2. Appellee Aleta Chrisman's Motion for Attorneys' Fees (Doc. 21) is **DENIED**.

3. The Clerk is directed to close this case.

**DONE** and **ORDERED** in Tampa, Florida on September 19, 2014.

Charlene Edwards Honeywell
United States District Judge

Copies furnished to:

Counsel of Record
Unrepresented Parties
United States Bankruptcy Judge Michael G. Williamson